*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DEPARTMENT OF TRANSPORTATION,

Plaintiff-Appellee,

v

NATIONAL INTERSTATE INSURANCE COMPANY,

Defendant-Appellant,

and

FRANKENMUTH MUTUAL INSURANCE COMPANY,

Defendant-Appellee.

UNPUBLISHED
November 26, 2019

No. 343009
Ingham Circuit Court
LC No. 17-000357-ND

Before: O'BRIEN, P.J., and GADOLA and REDFORD, JJ.

PER CURIAM.

Defendant National Interstate Insurance Company (National) appeals by leave granted the trial court's order denying it summary disposition and granting summary disposition and dismissal of defendant Frankenmuth Mutual Insurance Company (Frankenmuth). We reverse.

## I. FACTS

National insured Pahoa Express, a trucking company that contracted to transport an oversize load from Toledo, Ohio, to Sanilac, Michigan. Plaintiff, Michigan Department of Transportation (MDOT), issued Pahoa a single trip permit for the movement of the oversize load and specified the route in Michigan. The permit required among other things that the route be

-1-

checked for vertical clearance and overhead obstructions before movement of the load, that the Pahoa semi be accompanied by two escort vehicles, one in the front[1] and one to follow in the rear, and if the load's height exceeded 14'6" the lead escort vehicle had to have a fixed measuring device set at a height to assure clearance of the load. The MDOT permit required the escort vehicles and the Pahoa semi to maintain a distance of not less than 2,000 feet apart. The permit specified that the permittee "shall be responsible for damages to the highway, to persons, and to property caused by or arising from operations covered by this permit" and "shall indemnify" MDOT.

Frankenmuth insured the lead pilot vehicle.[2] The lead pilot vehicle had affixed to it a fiberglass pole the height of the semi's load to alert the driver to any potential clearance difficulties and if the pole hit anything overhead, the driver could alert the driver of the Pahoa semi.

The MDOT permit specified the directions the permittee could use for the transport of the oversize load and did not allow the Pahoa vehicle to use US-23. The Ohio permit, however, routed the vehicles to the Michigan border via US-23. According to Pahoa's semi driver, the drivers of the escort vehicles suggested that they use US-23 in Michigan to make their way back to the route permitted by MDOT. He agreed and the three vehicles traveled under two low overpasses while proceeding on US-23 before the subject accident. At those overpasses, the driver of the lead pilot vehicle alerted the Pahoa semi's driver via CB radio that his "stick hit," meaning that the fiberglass pole struck the overpass. Pahoa's driver understood that this message indicated that the load could pass under the overpass if he moved to the center lane for the highest clearance under an arched bridge and lowered the air suspension of the vehicle to reduce the load's vertical height. By doing this the Pahoa semi's load cleared the two low overpasses.

When the group reached the Milwaukee bridge spanning northbound US-23 in Monroe County, the driver of the lead pilot vehicle initially alerted Pahoa's semi driver via CB radio that his "stick hit," so the Pahoa driver moved into the center lane. A few moments later, however, the lead pilot driver communicated that his "stick broke," indicating that the overpass lacked sufficient height for the load to clear. The Pahoa semi driver did not have enough time to stop and the vehicle collided with the bridge causing significant damage.

MDOT sued National and Frankenmuth for property protection insurance benefits pursuant to Michigan's no-fault act, MCL 500.3101 *et seq.*, alleging that they both bore liability for the damage to the bridge in excess of $528,617.10. MDOT alleged that the lead pilot car driver and Pahoa's semi driver knew or should have known that they were not permitted to travel on northbound US-23 and they violated the MDOT permit.

---

[1] The parties called the front escort vehicle either the "lead pilot vehicle" or "lead pole vehicle."

[2] The insurer for the rear escort vehicle is not a party to this action.

National moved for summary disposition under MCR 2.116(C)(10), and asked the trial court to rule that Frankenmuth had partial liability for the damage to the bridge pursuant to *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 35; 528 NW2d 681 (1995), a case involving a multivehicle accident in which our Supreme Court explained that insurers of owners of vehicles having some physical connection more than a random association to an accident are potentially primarily liable for property protection benefits under MCL 500.3125.[3] National sought a determination by the trial court that Frankenmuth's insured was "involved in the accident" pursuant to MCL 500.3125. Frankenmuth sought summary disposition under MCR 2.116(I)(2)[4] and argued that the accident did not arise out of the operation of the lead pilot vehicle, as required under MCL 500.3121, but resulted from the communications between the drivers, which the no-fault act did not cover.

The trial court denied National's motion and granted Frankenmuth summary disposition. The trial court considered that facts in relation to our Supreme Court's explanation in *Turner* regarding what it means to be "involved in the accident," and concluded that the lead pilot driver's involvement was "too attenuated to be considered to be involved in the accident." The trial court reasoned that in *Turner*, the vehicles in the multivehicle accident had acted almost as a "unit" to cause the property damage. The trial court found "no real connection between the actual damage to the bridge and the use of the pilot vehicle."

Preliminarily, Frankenmuth asserts that this Court lacks jurisdiction over the instant case because National is not an aggrieved party as against Frankenmuth respecting the underlying litigation. We disagree.

In *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 291; 715 NW2d 846 (2006), our Supreme Court explained that an "aggrieved" party "must have some interest of a pecuniary nature in the outcome of the case," and "must have suffered a concrete and particularized injury[.]" Frankenmuth's jurisdiction argument lacks merit because National's liability could be reduced by half if Frankenmuth is found liable for personal property insurance benefits. Moreover, the trial court's decision to dismiss Frankenmuth adversely affected National because liability for the damage to the bridge following the decision rests solely on National. We conclude that National is an "aggrieved party" that has suffered a pecuniary injury by the court's decision, and therefore, this Court has jurisdiction over this appeal.

---

[3] MCL 500.3125 provides: "A person suffering accidental property damage shall claim property protection insurance benefits from insurers in the following order of priority: insurers of owners or registrants of vehicles *involved in the accident*; and insurers of operators of vehicles *involved in the accident*." (Emphasis added).

[4] MCR 2.116(I)(2) provides: "If it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party."

## II. STANDARD OF REVIEW

We review de novo a trial court's summary disposition decision. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). A motion brought under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim, and is reviewed by considering the pleadings, admissions, and other evidence submitted by the parties in a light most favorable to the nonmoving party. *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). Summary disposition is proper if there is "no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. A genuine issue of material fact exists when "reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). Summary disposition is properly granted to the opposing party if it appears to the trial court that that party, rather than the moving party, is entitled to judgment. MCR 2.116(I)(2); *Sharper Image Corp v Dep't of Treasury*, 216 Mich App 698, 701; 550 NW2d 596 (1996).

## III. ANALYSIS

National argues that the trial court erred by denying its motion for summary disposition and granting Frankenmuth's motion because, under *Turner*, the pilot vehicle that Frankenmuth insured constituted a vehicle "involved in the accident." We agree.

In *Turner*, our Supreme Court considered what vehicles in a multivehicle accident were "involved in the accident" to permit recovery from insurers of owners, registrants, or operators of the vehicles under MCL 500.3125 for property damage. In that case, a police officer driving a patrol car chased a stolen vehicle until it ran a red light at an intersection and collided first with a pickup truck in the intersection, then a second truck that split in half because of the impact, the rear portion of which crashed into a nearby building causing extensive damage. The police car did not collide with any vehicle or hit the building. *Turner*, 448 Mich at 25-26.

The building owners sought personal property insurance benefits from the insurers of the pickup truck and the truck that split and collided with the building (Auto Club Insurance Association (ACIA)), and the stolen vehicle (Royal Insurance Company (Royal)). *Turner*, 448 Mich at 26. ACIA filed a third-party complaint against the city of Ferndale, the self-insurer of the police car, claiming it shared liability for a portion of property protection benefits. ACIA moved for summary disposition against Royal and Ferndale regarding the liability issue. *Id.* at 26-27. The trial court granted summary disposition against Royal but denied ACIA's motion against Ferndale. *Id.* at 27. This Court affirmed. Our Supreme Court granted leave and explained that:

> Generally, a no-fault insurer will be liable to pay property protection benefits if the three following requirements are met:
>
> 1. There has been "accidental damage to tangible property arising out of the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle . . . ." Section 3121(1).

2. The facts do not implicate any of the statutorily enumerated exceptions for property protection liability. Section 3123.

3. The insurer insures the owner of a vehicle "involved in the accident," in which case the insurer will be primarily liable; or, the insurer insures the operator of a vehicle "involved in the accident," in which case the insurer will be secondarily liable. Section 3125. [*Id.* at 28-29.]

Additionally, "in a multivehicle accident, the liability of each insurer of an owner of a vehicle having some physical connection with the accident *will not* turn on whether the claimant can establish that the damage arose out of the ownership, operation, maintenance, or use of *each insured's* vehicle as a motor vehicle." *Id.* at 34-35 (emphasis in original). Under MCL 500.3121(1), a claimant must show only "that the damage arose out of 'the ownership, operation, maintenance, or use of *a* motor vehicle as a motor vehicle.' " *Id.* at 35 (emphasis in quotation added by the Court). Therefore, "[a] vehicle may be 'involved in the accident' even though the damage cannot be said to have arisen out of the ownership, operation, maintenance, or use of *that* vehicle." *Id.* at 35 (emphasis in original).

For "a vehicle to be considered 'involved in the accident' under § 3125, the motor vehicle, being operated or used as a motor vehicle, must actively, as opposed to passively, contribute to the accident." *Id.* at 39. Further, "a mere 'but for' connection between the operation or use of the motor vehicle and the damage" is insufficient to establish that the vehicle was "involved in the accident" under the statute. *Id.* Additionally, "physical contact is not required to establish that the vehicle was 'involved in the accident,' nor is fault a relevant consideration in the determination." *Id.* Rather, "the concept of being 'involved in the accident' under § 3125 encompasses a broader causal nexus between the use of the vehicle and the damage than what is required under § 3121(1) to show that the damage arose out of the ownership, operation, maintenance, or use of the motor vehicle as a motor vehicle." *Id.* The "involved in the accident" standard requires the determination that the vehicle made "an active contribution to the happening of the accident" and liability will not be imposed "simply because of a remote association between the insureds' vehicles and the accident." *Id.* at 41-42.

In *Turner*, our Supreme Court determined that the police officer's use of the police car while pursuing the stolen vehicle constituted active use that "perpetuated the stolen vehicle's flight, which, in turn, resulted in the collision with the other cars and the damage to the nearby property" despite the fact that the police car backed off its chase to deter the stolen vehicle from running the red light. *Id.* at 42. The Court concluded that "the use of the police vehicle as a motor vehicle had an active link with the damage, making it 'involved in the accident' for purposes of § 3125, and notwithstanding the fact that the same use could not be said to have given rise to the damage for purposes of § 3121(1)." *Id.* at 43. Thus, Ferndale, the insurer of the police car, had primary liability to pay a share of the property protection benefits. *Id.*

The case at bar presents the issue whether the lead pilot vehicle was "involved in the accident" under MCL 500.3125 for purposes of determining insurer liability for the property damage caused by the accident. Frankenmuth contends that its insured was not "involved in the accident" because, unlike the police car in *Turner*, the lead pilot vehicle did not "perpetuate" or "prompt" the movement of the Pahoa semi into the bridge. National argues that the lead pilot

-5-

vehicle, as part of a "caravan" having the role of guiding the Pahoa semi along the route, led the Pahoa semi, and therefore, constituted a vehicle "involved in the accident" under MCL 500.3125. We find National's argument persuasive.

The record indicates that the lead pilot vehicle actively, as opposed to passively, contributed to the accident in this case. The MDOT permit required the lead pilot vehicle to guide the Pahoa semi carrying the oversized load on a safe course in Michigan to avoid collisions with bridges and other obstacles under which the load could not pass. The lead pilot vehicle was equipped with the height measuring device and the driver needed to communicate with the Pahoa semi driver regarding whether adequate clearance existed for all overpasses to ensure that the Pahoa semi could safely pass under them or stop with sufficient time to avoid colliding with them.

The driver of the Pahoa semi testified that the lead pilot vehicle alerted him twice previously when the measuring device "hit" other overpasses. The record reflects that, up to and including the time of the accident, the lead pilot vehicle prompted and perpetuated the forward movement of the Pahoa vehicle by providing guidance and assurance regarding the chosen route. As explained in *Turner*, the lead pilot vehicle did not need to have physical contact with any vehicle or the bridge to be "involved in the accident." Rather, the active use of the vehicle as a motor vehicle that perpetuated the motion of another vehicle that caused property damage suffices to meet the "involved in the accident" requirement of MCL 500.3125.

Frankenmuth's argument, that the lead pilot vehicle was not "involved in the accident" because the accident arose out of a failure of communication between the drivers rather than as the result of the lead pilot vehicle's use of his vehicle as a motor vehicle, lacks merit. The lead pilot driver's ability to communicate information about the clearance of the overpasses, including its accuracy and usefulness, depended upon his operation of the vehicle in his role as the lead pilot vehicle escorting the oversized load transport vehicle. The lead pilot vehicle cannot be said to have a mere remote or random connection to the accident. The record establishes that the use of the lead pilot vehicle had a causal nexus with the Pahoa semi that collided with the overpass. The accident and ensuing damage arose because the lead pilot vehicle led the Pahoa semi under the low overpass. The lead pilot vehicle driver's failure to adequately warn the Pahoa semi driver of the low clearance does not mean that the lead pilot vehicle was not "involved in the accident" under MCL 500.3125. On the contrary, the vehicles and their drivers had inextricably intertwined roles in the caravan. The lead pilot vehicle led the Pahoa vehicle and its cargo into the bridge.

In *Turner*, our Supreme Court clarified that a causal nexus exists when "the relationship between the use of the vehicle as a motor vehicle and the injury . . . [is] more than incidental, fortuitous, or 'but for,' and [where] the vehicle's connection with the injury . . . [is] directly related to its character as a motor vehicle." *Turner*, 448 Mich at 32. In this case, the lead pilot vehicle's presence on the roadway cannot be said to have been incidental or fortuitous. It traversed the highway in advance of the Pahoa semi with the purpose of identifying clearance problems and assuring the safe passage of the Pahoa semi. The operation of the two vehicles was linked.

-6-

Frankenmuth's argument that its insured was not "involved in the accident" because it was too far away from the scene of the accident when it occurred also lacks merit. Although the MDOT permit required the lead pilot vehicle to be 2,000 feet away from the oversize load, and thus it passed under the bridge well before the collision occurred, we do not agree that the lead pilot vehicle thereby had no association with the accident. The determination of the issue whether a vehicle was "involved in the accident" does not turn on measuring the temporal or physical proximity of the vehicle to the accident. *Turner* makes clear that a causal nexus must exist that establishes more than a random, incidental, fortuitous connection between a vehicle and a property damage accident. Regardless of the fact that the lead pilot vehicle may have been 2,000 feet or more ahead of the Pahoa semi, a causal nexus existed sufficient to establish that the lead pilot vehicle was "involved in the accident" under MCL 500.3125. The evidence establishes that the lead pilot vehicle's action and inaction contributed to the happening of the accident. Accordingly, the trial court erred by ruling that the lead pilot vehicle was "essentially too attenuated to be considered to be involved in the accident." Therefore, the trial court erred by denying National's motion for summary disposition seeking a determination that Frankenmuth's insured was "involved in the accident" and by concomitantly granting Frankenmuth summary disposition and dismissal from this case.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Michael F. Gadola
/s/ James Robert Redford

-7-